The next case called for enlargement is Studer v. Blake. Counsel, when you'll be ready to make the suit. Good morning. My name is George Ripplinger and I'm Justin Studer's latest attorney. And we are here today because one of those attorneys decided to send a $160,000 check to Justin while he was incarcerated in state prison. Why a lawyer would do that, why anyone would do that is somewhat boggles the imagination. I don't believe that you'd ever need that kind of money to buy cigarettes in prison. I don't think there are banks available, at least no branch banks that I know of in prisons. There is absolutely no reason for Mr. Blake to even have the check. The check, and this is important to remember as we look at this case, was a life insurance benefit check payable to Mr. Studer due to the death of his father. Mr. Studer was the named beneficiary of his father's life insurance policy and he was entitled to those benefits. Now, Mr. Blake was representing Mr. Studer's mother who was the administrator of his father's estate. They were no longer married at the time of his death, but she volunteered to do that. And as the court knows, life insurance benefits payable to a named beneficiary are not part of the estate. That is a direct payment, a contractual payment, and the death is only the thing that triggers it. It goes directly to the named beneficiary. It wouldn't go into the estate unless the named beneficiary was deceased or is in fact left to the state or with no beneficiary. In this case, as a result of that, there was no obligation on the administrator and certainly no obligation on the administrator's attorney to apply for those types of benefits since it was not part of the estate. And Mr. Studer in prison did not hire Mr. Blake to do so. Did Mr. Studer sign some kind of a form or something in order to get the life insurance benefits? I believe he did. And did he know that the attorney was going to be sending that form to get them for him, or how did that come about? The mother went to the prison, had him sign it, and took it back. According to Mr. Studer, he informed his mother not to send the check to the prison. There's a difference of opinion about that. But in any event, there was no obligation to do so. And when Mr. Blake took it upon him, there was no obligation for him to do so even at the request of the administrator since it wasn't part of the administrator's duty. But when he took that upon himself, he assumed the duties that go along with being what's called a court of agent. Sometimes we look at these cases and we think lawyer, lawyer, lawyer, but lawyers do lots of things that are part of something that can be done by almost anyone. In fact, in this case, anyone could have applied for it and gotten the thing. So at this point, he becomes what I always called a court of agent. At that point, the court of agent has the same duties as an agent, and has the duty not only to do what he has voluntarily decided to do, but when he takes upon that, he does the thing that he volunteers to do without direction or permission. He has the duty to safeguard the items that he comes in possession of. In this case, it's $160,000. And part of that duty is to know what happens if you – the consequences of your acts. In this case, it would have taken too much to find out that there could have been a possible claim against that money for the incarceration expenses of Mr. Studer. Also, there's the other interesting thing that everybody missed was that we believe that the money was exempt from execution since it was a proceed from the death of a parent. A parent that apparently he was dependent upon? I don't believe that makes any sense. You don't? Why not? There are some bankruptcies. Well, this court didn't think there was. In the case, this court decided, I believe, in this case, People Act Bureau Director of Corrections v. Brockman. So long, in that case, the court held that they could get – I believe they could get – could not get the items because they couldn't remember. But the issue is whether or not the proceeds have changed into some other asset. If, in fact, Mr. Studer had cashed the check and bought stock, the stock would have been available to the state. There's a difference of opinion among several bankruptcy courts about that, whether or not it makes any difference whether it's the check or the check has become some other type of asset. This court – my memory of the case was that this court decided that it didn't say that it was the initial payment of the death benefit that it was exempt. Again, there's a difference of opinion between bankruptcy courts, but bankruptcy courts are a little bit different from this court. In other words, you'd read the exemption statute to be saying it's exempt for a parent or a child and some other person – aunt, uncle, niece, nephew – who was dependent upon the deceit. Right. And some courts say that the dependence has to be read – dependence has to be part of the description of the person who receives it. Other courts say, no, that is just an additional person who would have the exemption. So it depends on how you read the statute, and some courts have read it to be a description of all the people named after spouse that they have – their dependent children, for example. And other courts have read that, no, it's children and others who are dependent upon the individual. I think the courts that have – obviously, I think the courts who say that dependent is an additional type of beneficiary who receives the proceeds of the exemption, as opposed to a requirement that those additional persons be dependent upon the person who died. Okay. Set aside the exemption issue for a second. Your claim for damages is the money he had to pay for the cost of incarceration. Correct. And I think the court would replace it and say yes. Didn't he owe that anyway? He owed that anyway, didn't he? Set aside the exemption issue. If, in fact, he had been requested to fill out a form after he received that, he would have had to have listed that as an asset. And if it were not exempt, it would have been available to the state. However, the way the statute is written, there is no obligation for him to report after acquired property unless he is, again, requested to fill out the form. Furthermore, my reading of the statute is that even then, it's not an absolute forfeiture because it says that the Director of Corrections may request the Attorney General to seize the asset. So that appears – it seems to me at least – to leave some discretion in the Department of Corrections as to whether or not they are going to seize those assets, although I think in the practical matter most of the time they would do that. So basically your claim is he lost the opportunity to get by without having to pay something he owed. Is that a fair statement? I don't think there would have been a – I don't think you owe it automatically. I think that if he had – if Mr. Blake had kept the check in his desk drawer after four months of justice came out, I don't think that there would have been any misfeasance on anyone's part. I think if he – As long as he notified him, I've got your check. Under the ethical rule, he's required to notify him at least. Yeah, I think he would be. In asking for direction as to what he wanted to do, because that's what you do when you are an agent and when you become essentially a bailiff's property, you hold that, you safeguard that, and you hold it until you're given directions by the owner of the property of what to do with it. In this case, there was no direction requested, no direction given. It comes in the envelope, and I suppose the person who does open the prisoner's mail was quite surprised when he opened it up and that $160,000 check dropped out. It's not the kind of thing you would normally see potentially. And then it proceeded from there, which leads us into the other part where Mr. Storm was hired and filed a – began an all-practice claim against Mr. Blake and then went in and defended the seizure procedures and did not raise the issue of the exemption. And we got into the case in 2004 and promptly filed a claim against Mr. Storm, whose claims have been barred by the statute of limitations. However, there's only a four-month gap between Mr. Storm's firm representation and our filing claim against Mr. Storm. We pleaded the discovery rule, and I believe the discovery rule applies, and it had to be determined by the court, not just by whoever the charge of fact is, as to whether or not the discovery rule applies in this case. Mr. Storm has also raised the issue of statute of proposed, and actually, from the time of the settlement of the claim, until the filing was less than six years, I believe that is the negative impact of the settlement of the claim. And that is also the point in time where I believe the claim for excessive charging would rise, so that we're within the statute of proposed. Again, whether or not the statute of the discovery rule applies is something that should be decided by the trier of fact, not by the court in this situation. And so we believe that case should be reinstated. As to the defense, Mr. Blake is using the defense that he acquired under Rule 215 to speedily provide the funds he's holding for his non-client, the third party. I think that's a misreading of the rule. That's disregarding also the duty of both the court agent and of an attorney who is in possession of funds, along with the third party to safeguard them. I don't think that you would immediately rush out and throw it into the burning house, if that was the client's house or the owner's house, just because you had to hurry up and give him the money. I think that's the same thing that's true here. You should, again, wait for the contact of the client, ask for instructions, and abide by the instructions of the client. Again, if the state had come in and given him another questionnaire, he would be required to put it on. But he doesn't have to. I don't think the scooter owed that money until the procedure is started. And a court says he owes it, because that's the way the statute is set up. It says he shall pay his expenses, but it also says the process. There's no obligation to pay those expenses until such time as the seizure procedure is begun by the attorney general. There's a court order up until that point in time. He has no obligation to take money out of his pocket. So I don't believe he had that. He had an obligation to be honest, and the corporate correction had the right to ask, do you have assets, and then proceed from there. So if we were to find that that was legal malpractice, don't you have a problem with proving your damages with respect? Proven not that it's exempt.  But if it isn't exempt, how do you show that you're entitled to any damages if the DOC comes in and says we're entitled to be paid for his expenses? If he hadn't sent a check to the DOC, he never would have done it. And there would have been absolutely nothing illegal or wrong about that. He would have gotten away with it is what you're saying. Everybody talks about getting away with it. I don't think there's anything about getting away with it. There's a process. Until that process goes in, he's hidden nothing from the state. I understand how everybody feels about this case. But in a trial, they're going to bring in a representative of the DOC, and they're going to say, what is your process? Presumptively, they're going to say, when somebody's about to leave, we have them fill out this form. They fill out the form when they come in for the process. And we've already opposed these folks. And sometimes they give them a note and sometimes they don't. Generally, that is part of the end process. The form is given to the prisoner when they come in. They fill it out, and they never get anything. That gets back to my question about it's a lost chance case. Well, yes, it is. That's probably the best way. There's some jury instructions on that even now. So, in other words, it's not the kind of case that has a lot of jury appeal. We all understand that. It's not one we would be very happy about. The taxpayers would love a whole lot. But when they come right down to it, it never should have happened. And, again, I still don't understand how anybody would send a $160,000 check to somebody when there's nothing they can do with it. It's unusual it wasn't going into a trust account. I was going to say, one of the ways to deal with it was to give me a power of attorney and charge the check. And, again, you've got to deposit it in the trust account until he gets out. Four months later, it's only a half an hour to go. And that was well known, the four months, his discharge? I'm sure he knew it. Yeah. It's easy to find out how long you're going to be in there. Communication is a wonderful thing when it happens. In this case, what we have here, Paul Newman says, is failure to communicate. And that's where everything started. There was no communication before Mr. Blake got the check, and there was no communication after he got the check. The only communication that happened, the first meaningful communication, was when the fellow who opened the envelope at the prison went to the warden and said, look what I got. And that's where things started. Thank you, Counsel. Counsel? May it please the Court, Counsel. My name is A.J. Bronski. I represent Ed Blake and his law firm in this matter. Your Honors, I would request that you affirm the decision of Judge Lachine and affirm the granting of summary judgment on behalf of Mr. Blake and his law firm. We vehemently disagree with Mr. Ricklinger's interpretation of what I call the reimbursement statute because the reimbursement statute is crystal clear that a committed person shall be responsible to reimburse the department for the expenses incurred by their incarceration. It doesn't say if we find out that you have money. It puts the burden on the inmate. The inmate is statutorily responsible to reimburse the State of Illinois so that the taxpayers don't have to pay for his dependent status on the State of Illinois. Why then isn't a judgment entered against every inmate for the cost of their incarceration and then either they can pay it or they can't? Well, there probably could be if the State wanted to expend those resources in order to do that, but the State through the Attorney General will do that when there is information that they have money. So in practice, every inmate doesn't pay his cost of incarceration? They're responsible to, but they probably do not. And the State doesn't go after all of them? The State does not go after all. So there was a chance Mr. Studer wasn't going to have to pay it? Not really because Mr. Studer went back into jail and he had to fill out one of these forms. Interestingly, he denied that. Oh, he went back in again later? Yes, sir. So if we go back to trial and we try this case, the same outcome is going to occur here because unless he took the money and spent it and did drugs or whatever and expended $69,000, otherwise the State would have been entitled to the money. So there realistically is no damages in this particular case. You know, Mr. Blake did what he was ethically required to do. Judge, you brought up the idea as to, well, you know, how did Blake get this check? Well, Blake was representing the Estate as part of his actions as attorney on behalf of the Estate. He commonly assists the beneficiaries in obtaining life insurance for the deceased. That's not an uncommon practice. It's not an uncommon practice, and even plaintiff's expert says he does the same thing. It is not an uncommon practice. And so when Mr. Blake gets this check, he's not representing Justice Studer. He's representing the Estate. Justice Studer falls into the category as a third person under the Rules of Professional Conduct 1.15. And so he does what he should do, which is he's got property of a third person, and he provides that property to the third person, which is what happens here. The third person, Mr. Studer, got his check. Unfortunately, at the time that he got the check, the State also recognized that Mr. Studer now had some money to pay for his incarceration, and so they attached it. And then Mr. Storm came along and litigated that attachment proceeding, and they entered into a consent judgment whereby Mr. Studer gave the State $69,000. But Mr. Blake met his ethical responsibility. That's not the only way he could have met his ethical responsibility, though. Do you agree with that? He could have just notified him and said, What do you want me to do with the check? And that also would have met his ethical responsibility. He certainly could have done that, Your Honor, although that probably would have also put the State on notice of the existence of the money. Might have. Right. You know, they've argued that he should have put it in his desk or waited for three or four months. I mean, we could have been up here if, for example, this insurance company went into liquidation or receivership during the time that Studer signed off on the application for the insurance proceeds and the time he got out, and then everybody would have been saying, Gee, Ed Blake, why didn't you get the insurance money? So, I mean, it's a double-edged sword, really, as to what he should do, and I don't think that there's any standard of care to be utilized in that circumstance. And so the only guidance, really, is the rule of professional conduct, which says you are to notify and provide that property to the third person, both of which he was doing with his letter to Mr. Studer and closing the check, sending it, certify mail return, receive request, and so he knew that that person got what they were entitled to, their property. It's unfortunate that the state took the money, although the state is certainly legally able to do that. Mr. Bronski, I presume that the mother got appointed, the ex-wife got appointed administrator through the son, by some kind of agreement or something? I mean, otherwise she wouldn't? Right, he agreed that she could serve in the capacity, and he also waived the requirement that she serve with the father. Okay, so presumably there's communication going on between the mother and the son, and he could have easily, Mr. Blake could have easily, I mean, yeah, Mr. Blake could have easily asked the mother to contact the son and find out what he wanted to have done with the check. Well, Mr. Blake's testimony has been that he told Tammy Nichols, the mother, that he could go get the life insurance and that he would do so, gave her the actual application to take to the prison's ramp correctional facility for Justin Studer to execute, which he did. And they were talking about trying to put the money in trust, but there was no decision ever made, and what Mr. Blake had learned from the mother was that Justin wasn't interested in putting the money in trust, that Justin wanted the money, and so when it came in, he sends it to Justin Studer. He never received any communication from either Mr. Studer or Tammy Nichols, the mother, instructing him not to send it to Justin Studer, and that was the understanding that he would be sending the money to Justin all along. And I know I'm probably running short of time. I wanted to talk about this exemption just briefly. This court cited with approval the bankruptcy case of Bunting. Bunting was the case that interpreted this exemption statute language to say that when the beneficiary is a child, that person has to be dependent upon the deceased, and this court has also determined that someone who is in prison is not independent on anybody but the state of Illinois. And it's clear. Which case is that? What if they're paying the cost of their incarceration? Are they dependent on the state then? Well, maybe not, but at the time that the insurance was issued, he was dependent on the state because at the time that his father unfortunately passed away, he was already in prison. And so, again, and then the last point that I would like to make is that we've gone through all sorts of machinations as to what the cause of action would be against Mr. Blake from the time that Mr. Storman had it down to the time that Mr. Rifflinger has it. As it stands right now in the pleadings, there was the negligent performance of a voluntary undertaking. That's the cause of action that's pled. And I cited in our brief the Wise-Blatt v. Chicago Bar Association case, which talks about Moorman and the Nelson v. Wire Grove case, that when you have strictly economic damages, which is what we have here, there is no cause of action in Illinois for negligent performance of a voluntary undertaking and therefore a cause of action does not lie under their Fifth Amendment or Fifth Amendment complaint or even the Sixth Amendment complaint that they tried to file, which was denied. So with that, Your Honor, unless there's any other questions for me, I'll sit down and let Mr. Storman talk. I don't believe there are. Thank you. Thank you. Counsel? Your Honors, it is a pleas to the Court. Thanks to Paul Storman. And either I'm a fool, I've hired a fool as a lawyer, or I'm a fool as a client. I'm representing myself in this matter, so you can draw whatever conclusions you want from that. My defense here is a purely mathematical defense in the fact that on February the 12th, 2000, Tamra Nichols, the mother of Jason Studer, contacted my office when I was practicing law with Jennifer Teague and asked us if we could represent her son and we could go see him and blah, blah, blah. And we found out he was in Graham in Hillsboro, and we found out that this was a very unique situation in the fact that I think there was only one other inmate that they ever took their money. And that was what I had understood. And Jennifer, of course, we talked, and it was a lot of time and travel and everything else. And we decided to take the case for a retainer of $15,000. And we told her, she said, fine, fine, fine. And I said, no, no, no. You make sure you talk to your son and get an agreement. We get an agreement in writing from him that that's what he wants to do. And there's no guarantees. We have no precedent here. There's no guarantees we can win this case or not. So he then sent that letter, which is a part and parcel of his file, saying that he wanted me to represent him. And that was, I think, February 15, 2000. It's in the situation. And Jennifer and I did represent him, and she made the final situation, which he approved of. And strictly speaking, the first time that I was ever brought into this case by Mr. Studer was June 5, 2004, timeline. All right. This is clearly more than two years. And, of course, we read the malpractice statute, 735 ILCS 513-2143. It states that the action must be commenced within two years or from the time the person bringing the action knew or reasonably should have known that the injury for which the damages are sought. And then the statute of repose is six years. Okay. And so the allegation here is breach of contract. Exactly. So it would be two years from the breach. No. Malpractice just says two years from the date of the contract. And he knew or should have known, so how would he know that he could sue for breach of contract until there was one? Well, let me get to that. Well, anyway, here's the situation. He's alleging that the breach of contract. We aren't alleging a breach of contract. We're saying we fulfilled our contract, and he agreed and signed all the documents and everything else. We're saying that this is a buyer's remorse. That's what we're saying. And we also say that we were hit by a scattergun by Mr. Ripley. Now, the Third Amendment complaint, which first included me in that case, never mentioned knew or should have known. That's not part of Mr. Ripley's allegation. Although he had the case, although he said he talked to the guy April 6th, 2004, he never put that in his complaint, that knew or should have known. It was strictly a two-year deal, okay, that violates the statute of limitations on that count three. And correctly, Judge Lesheen dismissed the case of prejudice. Now, Mr. Riplinger then comes along in count four, which he filed, count four, he filed January 26th, 2005. Now, he says in this count that he knew or, excuse me, he filed exactly the same counts as he did in count three. That the violation of professional reasonable charge of fees and also the breach of contract action. Only in count four, he puts the magic language down in the complaint. And says that the plaintiff did not discover that the fee charged by Starment and Teague was excessive until he consulted with his present counselor, George Riplinger, for the first time on April 6th, 2004. Now, all along this guy's complaining that Blake charged him too much, he's plagued with his mother's taking his money and everybody's charging him much. They did not get enough money for his house. You know, he's just all over the place with who has put it to him. And the thing I want to bring up to this court is this. Why would George Riplinger, love him to death, make that allegation when he never asked me for any time sheets? He never asked us for how much time we spent. He never asked us what cost we had in case. I have a bill. We kept a bill on this situation. How would George Riplinger know from what Justin Studer told him that this fee was excessive? Now, I know it's a plea, but didn't Studer tell him that he'd been in jail four or five times since this? That he'd had traffic violations? That he had this, he had that, he had other agreements? And didn't he tell Studer that he had a contract with our office? Didn't he tell Riplinger any of these things? And Riplinger said, hey, Starver, just send me your time sheets. Just tell me how much time you spent and how much time you charged him before he makes such a bald allegation as he's made here. Well, Judge Lacheen didn't buy that. Judge Lacheen didn't buy that. He dismissed the case again with prejudice on January 26, 2005. Dismissed it with prejudice. Well, count four is gone. It's the same thing as count three, except newer should have known. That's gone. Now, what does it take to draw a blossom to a close until the appeal time comes? He got two dismissals with prejudice. Count three, count four. Now he files a count five, exactly the same as count four. And a summary judgment is ultimately granted on that. And then, lo and behold, he files a count six, February the 10th, 2009, nine years later, after the commencement of this entire situation. And he's a left in that count that we didn't do, or I didn't do, and I couldn't protect him based upon the statute that Mr. Bronson has previously testified to. Count six is exactly like all the other counts, except in G. He added a G. Failed to properly defend the suit of Justin Studer in behalf, and he failed to raise the defense of exemption from attachment of life insurance policy pursuant to Illinois statute. Now, let's assume three and four, and not assume, three and four dismissed with prejudice. And then in 09, now he comes along and he adds a brand new allegation. And it's clear that it's beyond the statute of repose. And this court has ruled on that in, well, you ruled on, knew or should have known, this court has in Cuito. It says, a fella cannot stand around thumbing his fingers and cannot hold a defendant's equity to stop when he simply does nothing to learn, or does nothing to learn what the situation is. You've decided that very clearly, and what a plaintiff should do in McIntosh v. Cuito. That's your case, Fifth District. Now, in Hester, we taught you also, this is a case decided by Judge Keene. And Hester v. Diaz also says that a legal malpractice case, once you hit the six years, that's the end of the tale. That's it. That's it, that's that. That's it, that's that. So, this Sixth Amendment complaint, as far as I'm concerned, with all the other allegations already dismissed with prejudice, is over with. And that's why Lachine did not allow the Sixth Amendment complaint in this particular matter. I ask the court to, I thank the court very much for your time. And I think if you read these complaints, and amended complaints, and things of that nature, you're going to find that it's one of those things that was put in a processing machine and spit out and filed with the court. Because it's all the same, except for two, six, and four. Thank you so much. And I'm sorry that I was not in the practice of law from 203 to 205, or I would attach the copy of the contract that I had with him. But I don't have it. Thank you so much. Thank you, counsel. Counsel? Just briefly. Mr. Blake is so concerned about getting assets to Mr. Studer that there was one other asset he wasn't quite concerned about, and that was the annuity check that he also applied for. And had Mom sign Justin's name to it so it would be caged for his fees. It's not a real consistent situation we've got here. And Mr. Blake seems to be concerned about certain things when it fits his purposes, and certain other things when they don't. This is a situation where he had an obligation to protect the assets, and all the assets, and he didn't do it. And whether or not our guy's a jailbird, he's still a citizen of the United States, and he has the same rights as all of us. Thank you, counsel. We appreciate the briefs and arguments of counsel. We appreciate the case under advisement.